JESSE JEWELL v. BENJAMIN STURGES and KANSAS CITY BOLT & NUT COMPANY; KANSAS CITY BOLT & NUT COMPANY, Appellant.

In Banc, November 26, 1912.

1. **NEGLIGENCE: Master and Servant: Independent Contractor: Liability of Master.** If the owner of a milling plant undertakes to furnish the place where and the appliances with which his independent contractor is to perform his contract, and retains possession and control over said place and appliances, then the contractor and his employees, though paid by him, have the same right that an ordinary employee has to demand of the owner that the place and appliances be reasonably safe for the purposes for which they were furnished; and if the employee of said independent contractor, in the performance of his work, was injured, because the owner, under such circumstances, negligently failed to provide him reasonable protection against the dangers naturally incident to his work, the owner is liable in damages for his consequent injuries.

2. ————: ————: ————: ————: **Bolt and Nut Mill.** The plaintiff was an employee in a rolling mill which manufactured bolts and nuts. As the long strand of steel passed through the rolling machine it was his duty to catch it with a pair of tongs and circle it around and start it in the opposite direction through another machine, before the other end was out of the first. He worked inside the semicircle made by the strand, and to protect him, in case it drew taut, there was a hole in the floor for an upright post in the middle of the semicircle, but the owner had failed to place such a post, but instead had placed there an iron spindle and some other materials, and while plaintiff was engaged in the performance of his duties as catcher, the rear end of the strand caught in the roller, it surrounded and knocked aside the iron spindle and other materials, wedged him in between the strand and a tub of water that stood near, and so burned him as ultimately to cause the loss of his foot. There was evidence that the foreman was an independent contractor, who, at a scale of wages fixed by a labor organization, hired and paid some of the men, including plaintiff, out of money paid him by the defendant company at the stipulated prices, and retained the balance so paid him. But the evidence is undisputed that the defendant company owned the entire plant, including the rolling mills, and had exclusive control

over every department thereof, and supplied all the machinery and tools and made the necessary repairs. *Held*, that the court properly submitted to the jury the question whether the relation of master and servant existed between plaintiff and defendant company, and they having found such relation did exist, and that the failure to supply a sufficient post to protect plaintiff from the encircling strand was negligence, the verdict should be affirmed.

Appeal from Jackson Circuit Court.—*Hon. Joseph A. Guthrie*, Judge.

Affirmed.

*Rees Turpin* and *A. P. Woodson* for appellant.

(1) Appellant was not negligent. The theory upon which the case was submitted is not embraced in the petition. Koenig v. Railroad, 173 Mo. 698; Nugent v. Milling Co., 131 Mo. 241; Glass v. Gelvin, 80 Mo. 297. The master performs his full duty when he furnishes proper appliances—he is not liable for failing to prevent their misuse or nonuse. Blundell v. Manufacturing Co., 189 Mo. 552; Grattis v. Railroad, 153 Mo. 380; Mathis v. Stock Yards Co., 185 Mo. 434; Kelley v. Lawrence, 195 Mo. 75; Bradley v. Tea Co., 213 Mo. 320. *A fortiori* is this principle applicable here because plaintiff was not employed by appellant and was not under its control. Hexamer v. Webb, 101 N. Y. 377; Kiser v. Suppe, 133 Mo. App. 19; Farmer v. Kearney, 115 La. 722; Forge Co. v. Cooper, 131 Ind. 363; Miller v. Moran, 39 Wash. 631; Dane v. Chemical Co., 164 Mass. 453; Harris v. McNamara, 97 Ala. 181; Reier v. Spring Works, 109 Mich. 244; Ziebell v. Lumber Co., 33 Wash. 591; Nugent v. Steamship Co., 147 N. Y. 709; Burns v. McDonald, 57 Mo. App. 599; Hilsdorf v. St. Louis, 45 Mo. 94; Fink v. Furnace Co., 82 Mo. 276; Gayle v. Car Co., 177 Mo. 427; Clark's Admx. v. Railroad, 36 Mo. 202; Blumb v. City, 84 Mo. 112; Mc-

Kinley v. Railroad, 40 Mo. App. 449; McGrath v. Railroad, 215 Mo. 191; Davies v. Railroad, 159 Mo. 1. (2) Plaintiff was guilty of contributory negligence. McGrath v. Transit Co., 197 Mo. 97; Davies v. Railroad, 159 Mo. 1; Wheat v. St. Louis, 179 Mo. 572; Degonia v. Railroad, 224 Mo. 564; Diamond v. Kansas City, 120 Mo. App. 185; Caldwell v. Railroad, 181 Mo. 455. (3) Plaintiff assumed the risk. Mathis v. Stock Yards Co., 185 Mo. 434; Purcell v. Shoe Co., 187 Mo. 276. (4) The damages were grossly excessive. Neff v. Cameron, 213 Mo. 350; Chlanda v. Transit Co., 213 Mo. 244; Brady v. Railroad, 206 Mo. 509; Newcomb v. Railroad, 182 Mo. 687; Reynolds v. Transit Co., 189 Mo. 408; Lessenden v. Railroad, 238 Mo. 247.

*Reed, Yates, Mastin & Harvey* and *H. J. Latshaw* for respondent.

(1) The relation of master and servant did exist between the Kansas City Bolt & Nut Company and Sturges, and between the company and respondent. This exact point has been decided in a case upon a contract similar to that between the Kansas City Bolt & Nut Company and Blue Valley Lodge. Iron Co. v. Gray, 19 Ind. App. 565. (2) None of the things that ordinarily obtain in order to constitute an independent contractor, were present in the contract relations between Sturges and the Kansas City Bolt & Nut Company. There was no agreement that he should do any specified quantity of work, nor that he should be paid so much for the completion of any given amount of work. According to the uncontradicted evidence he did not have supervision or control over the place where the work was done; nor over the means or appliances by which it was to be done; and while he paid certain of the men out of the gross sum specified in the contract in evidence as "scales of prices" and "wages," he did not pay all of the men engaged in

the common employment; nor did he have the right to employ or discharge whom he pleased. He himself was subject to discharge by the company at any time, as were the men who worked under him. Moreover, by the terms of the contract between Blue Valley Lodge and the company, men working like Jewell, in the designated capacity of "catcher," were to be paid by the company. All of these enumerated facts are uncontradicted by the evidence. (3) Even though it should be held that Sturges was an independent contractor, nevertheless, in view of the facts shown by all the evidence, that the appellant owned the entire plant in question, and had exclusive control over every department thereof, whatever may have been the relation that existed between the appellant company and Sturges, whether that of contractor or vice principal, the law imposed upon appellant the duty to exercise ordinary care in seeing that the place where Sturges and his assistants worked, and the instrumentalities with which they were to do their work, were reasonably safe. Jewell v. Bolt & Nut Co., 231 Mo. 195; Morton v. D. G. Co., 126 Mo. App. 395; 2 Labatt, Master and Servant, Sec. 559. (4) All of the questions decided upon the former appeal are threshed over again in the appellant's brief. The question of contributory negligence in this case was for the jury. Jewell v. Bolt & Nut Co., 231 Mo. 199; Dupuy v. Railroad, 110 Mo. App. 123; Shepherd v. Transit Co., 189 Mo. 371; Dakan v. Chase, 197 Mo. 267. Even where plaintiff knew of the danger, yet he was permitted to recover upon the theory that it was for the jury to say whether the danger threatened immediate injury. Burkhead v. Rope Co., 217 Mo. 408. And unless the only conclusion that can be drawn from the facts is that there was contributory negligence, the question is for the jury. Campbell v. Railroad, 175 Mo. 175; George v. Railroad, 225 Mo. 367. (5) There is no question of assumed risk in this case. Jewell v. Bolt & Nut Co.,

231 Mo. 194; Panck v. Beef Co., 159 Mo. 457; Huhn v. Railroad, 92 Mo. 447; Halloran v. Iron Co., 133 Mo. 476; Cohn v. Transit Co., 183 Mo. 94.

WOODSON J.,—Because of a dissent in Division, this cause was transferred to court in Banc; and after a rehearing was had, the latter adopted the divisional opinion of WOODSON, J., as the opinion of the court in Banc, in which VALLIANT, C. J., KENNISH and BROWN, JJ., concur; and LAMM, GRAVES and FERRISS, JJ., dissent.

Said opinion is in words and figures as follows:

This case was here on a former appeal and the opinion affirming an order of the circuit court, granting the plaintiff a new trial, is reported in 231 Mo. 176.

The facts of the case were fully stated in detail, by the court, in the opinion before mentioned, and for that reason, they will be but briefly stated here; reference is made to that case for a statement of the facts as they appear by the record in this appeal.

Briefly stated, the defendant was a large manufacturing concern, which manufactured various products made of iron and steel, and among other things it made rods, bolts and nuts. A part of the work necessary to produce those articles was to heat and roll large bodies of iron through the rolling mill, which constituted one of the departments of the defendant company's plant. That was accomplished in the following manner:

"Scrap iron was bundled up, bound together and heated to a white heat in a furnace. It was then run through a set of rolls by other employees, called roughers, and thus formed into billets some three feet in length and three inches thick; it was then passed to another set of employees, called strainers and catchers, of which plaintiff was one, who passed it through other sets of rollers several times, reducing

it each time in thickness and increasing its length until it reached the desired dimensions.

"The rolls at which plaintiff was engaged stood in an east-and-west direction, containing several sets of rolls about fifteen feet in length. The plaintiff occupied the north side of the string of rolls. Those working with him were on the south side of the string of rolls. Those on the south side would take a billet from the roughers and place the end of it in the rolls, the rotary motion of which would convey it to the north side, where the plaintiff would catch it with a pair of iron tongs, and place the end of it in another set of rolls beneath the ones from which it had just passed, and it would be carried back to the south side by the same means and reduced in thickness and extended in length, as previously stated. This method was continued until the bar was some thirty or forty feet in length, when the process of 'repeating' was begun, that is, the plaintiff would catch the end of the bar with a pair of tongs as it came through at the east end of the rolls and carry it around north in a semicircle and place the front end in the rolls at the west end of the string which so ran as to carry the bar back to the south side. By this process the bar would be coming through at the east end of the string of rolls to the north side and at the same time it would be going through the rolls to the south side at the west end of the rolls."

The foregoing quotation is taken from the statement of the case in the former opinion.

The evidence showed that some eight or ten feet back from the set of rollers there was a hole made in the floor of the mill, in which an iron post was designed to be inserted, when the "repeating" process, before mentioned, was being carried on. This was intended to prevent the catcher from being caught in the loop of the bar, and drawn up to and crushed by it against

the rollers, in case the rear end thereof should for any reason hang in the roller.

That at the time of the plaintiff's injury, said post was not in position, but in lieu thereof, an iron spindle and some other materials were placed on the floor, near said hole.

That while the plaintiff was engaged in the performance of his duties as a catcher, the rear end of a rod caught in the roller, and the loop thereof surrounded and knocked said iron spindle and other materials aside, and caught the plaintiff just above the ankle of the foot, and drew it up against a tub of water, which was sitting between him and the rollers, and so burned, bruised and mangled his leg, that after suffering excruciating pain and mental anguish for a year or more, it became necessary for his limb to be amputated just above the ankle.

The second trial resulted in a verdict for the plaintiff for $18,000, of which he remitted $3000, leaving $15,000 for which judgment was entered, and in due time the defendant appealed.

All of the questions except one presented by the record on the former appeal, were carefully and fully considered and disposed of by this court, in the opinion before mentioned.

Counsel for the defendant, at the second trial, retried in the circuit court all the questions passed on by this court on the former appeal, and have rethrashed them out here on this appeal, and request us to reconsider them at this time. After a careful reexamination of the questions of fact and law presented by this record, we are satisfied that the conclusions reached, when the case was here before, were correct; and no good would be accomplished by restating or passing upon them again.

We will content ourselves at this time by first restating the question not passed upon in the former opinion, and second, the substance of the evidence

bearing upon it, all of which was not introduced at the former trial, namely: that the plaintiff was not working for the defendant at the time he was injured, but was employed by and was working for the Blue Valley Lodge No. 2, of the National Amalgamated Association of Iron, Steel and Tin Workers, and that in consequence thereof, defendant company was not liable to the plaintiff for the injuries received by him.

The evidence in this case covers more than four hundred pages of printed matter, and a large portion of it relates to this question, and we will therefore only be able to set out the substance of part of it and the effect of other portions, which is as follows:

A contract between the defendant company, and said Association of Workers, which is as follows:

The portions of said document introduced in evidence being in the words and figures following:

Page No. 3.   Ex. 1-A. E. P.
Sheffield, Mo.

WESTERN SCALE.

Memorandum of Agreement.

We, Kansas City Bolt & Nut Co., of the first part, and Blue Valley Lodge No. 2, State of Missouri, National Amalgamated Association of Iron, Steel and Tin Workers, of the second part, do hereby agree that the following scales of prices, based upon the actual sales and shipments of iron or steel, as arranged for in conferences, shall govern the wages of the several departments as herein stated, commencing July 1, 1902, and ending June 30, 1903.

It is further agreed that no scale shall go below the base price named on the rate selected.

It is understood: First, That iron mills (except sheet mills) working steel shall pay price and one-half price for steel, but this shall not apply to mild steel, that is, working that steel of which the output of the mill shall be as great as when working iron of the same sizes; but when the output of steel is but three-fourths of the output of iron, the rule price and one-half shall apply.

Second:  On all mills working iron or steel weighing one hundred and thirty pounds, or over, extra help shall be furnished to the heater, the same to be paid by the Company.

Third:   The time in scrapping and busheling, also finishing departments, shall in no case exceed nine hours and fifteen minutes from the regular time the mill begins to roll until the first furnace commences to charge the last heat.   This shall not apply to mills working shorter charging hours; this not to apply to boiling departments (except scrapping and busheling); also other departments working under the three-turn system.   The time for meals on following up mills shall not be counted in.

Page No. 4.   Es. 1-B E. P.

Fourth:   Wherever deviations from the Western Iron Scale, signed for by any manufacturer and the Amalgamated Association, are made and evidence is produced to prove it, the Amalgamated Association and manufacturers agree to make every effort to correct the same, provided the trains and furnaces are similar, but if the deviations continue to be tolerated by the Amalgamated Association, all other mills shall receive the same.   All manufacturers and workmen governed by this scale hereby agree not to make any deviation from the scale agreed to.

Fifth:   Finishing mills will be allowed to work three turns when practicable.   On finishing mills working or desiring to work three turns, eight hours shall constitute a day's work. Rolling shall not start earlier than 5 a. m. Monday morning, and first furnace shall cease charging at 11:30 a. m. on Saturday. The last furnace shall not charge later than one hour after the first furnace, and close the week's work.   On all mills working three turns a third roller shall be employed.

Sixth:   All ten-inch guide and hook mills with one furnace averaging $35 per turn or more, or with two furnaces $65 per turn or more on a 9¼ hour system, based on a one-cent card rate, the eight-hour system shall be adopted.   On bar and twelve-inch mills averaging 60,000 pounds on one furnace, and 85,000 pounds on two furnaces per turn on the 9¼ hour system, the eight-hour system shall be adopted.

It was agreed that the base price at a one-cent card rate, based on actual sales of bar iron, as per conference agreement, with extras, shall be the straight one dollar and twenty-one cents per ton for rolling, sixty-one and seven-tenths cents for heating, thirty-two and three-fourths cents per ton for roughing, and catching on guide, ten-inch hoop and cotton tie mills with two per cent additional for each one-tenth advance or decline on said card from one to two-cent card rate.

"The rollers, heaters, roughers and catchers shall each be paid by the company.   It is understood, how-

ever, that this arrangement shall in no way detract from the authority of the roller in controlling all hands on mill, including hiring and discharging, and, as heretofore, the roller shall be held responsible for the work done. Bar mill heating price to govern base sizes alone.''

Arthur Palmer, the night boss roller, testified that:

''Q. Now, this book speaks of the authority of the roller in controlling all hands in the mill. Now, what is it you call the mill? A. That is the train of rolls, and all the furnace men, and so forth.

''Q. That means the working part of it that is done from this furnace? A. Yes, sir. There were two furnaces on the mill, and the roller has charge of the heaters and all hands on the mill.

''Q. All hands engaged in rolling iron? A. Yes, sir.

''Q. When Jesse Jewell, the plaintiff, was injured there? A. Yes, sir.

''Q. In what capacity? A. As roller—foreman, rather.

''Q. Who employed you? A. Mr. Sturges.

''Q. Mr. Benjamin Sturges, the defendant here? A. Yes, sir.

''Q. By 'roller' you mean a subroller under Mr. Sturges? A. Yes, sir.

''Q. How long had you been working under Mr. Sturges? A. Well, about, possibly eight years.

''Q. At this same plant? A. Yes, sir.

''Q. Were you a member of Blue Valley Lodge No. 2, National Amalgamated Association of Iron, Steel and Tin Workers? A. Yes, sir.

''Q. Was Mr. Sturges also a member? A. Yes, sir.

''Q. And were you the roller on the shift on which Mr. Jewell, was engaged at the time he was injured? A. Yes, sir.

''Q. Who paid Mr. Jewell? A. Mr. Sturges.

"Q. State whether or not there was an inspector employed by the company to inspect this iron? A. Yes, sir.

"Q. Where did he work? Where did he inspect it? Where was the inspection made? A. Well, it was after it got cold—after it got sheared and cold, it was taken to the scales and unloaded, and as it was unloaded it was inspected. I presume that is the way they inspected it.

"Q. Now, do you know whether this rolling work was done under this kind of an agreement, from year to year, from 1895 and '6, on down to the time Jewell was hurt? A. Yes, sir. I believe the agreement has always been there, the same—about the same.

"Q. And they were made before the expiration of the year—the one for the succeeding year would be made before the expiration of the one for the present year? A. Yes, sir.

"Q. So they were continuously working under the scale? A. Yes, sir."

John P. McLaughlin testified:

"Q. What position, if you know, did defendant Benjamin Sturges, on December 9, 1902, and for a number of months previous thereto, hold in the rolling mill of defendant? A. He was the man that had the whole charge of the mill.

"Q. Whose duty, if you know, was it to inspect the machinery, appliances, tools and safeguards, if any, furnished the employees? A. Now, in regard to that question, I would like to make a little explanation.

"Q. Answer it in whatever way you believe to be true. A. It is customary when a roller gets a position as a roller on a mill, he has full charge of that mill—the mill is under his care; everything is under his care, and as a rule, whatever appliances he recommends, whatever appliances he needs, will be given to him."

Benjamin Sturges, one of the defendants, who had been employed in this mill for two years prior to the date of the injury, testified:

"Q. Some of the men, I believe the evidence showed, were paid by the company direct? A. Yes, the heaters and roughers.

"Q. Who would employ them—hire them? A. I did.

"Q. Did you have the right of discharging, too? A. Yes, sir.

"Q. Superintendent of them, while they were doing their work? A. That is, these rollers and—

"Q. Which? The heaters and roughers, and men that were paid by the Company, did you direct them in their work, too? A. Oh, yes; yes, sir.

"Q. Now you received so much a ton for the finished product of iron rolled in that mill? A. Yes, sir.

"Q. Whether it was rolled by your shift or any other shift? A. Any other.

"Q. Did you have three shifts when you first started in? A. No, sir.

"Q. And then you paid the stranners, scrapers, finishers—these men were paid by the scale, and then you employed some laborers who were not paid by any scale? A. Yes. There was some of them not in a scale at that time.

"Q. You employed several men of that kind? A. Yes.

"Q. You went and came as you thought the business demanded? A. Yes.

"Q. Did you leave any record in the office of the time you spent there? A. Well, I think they have a record. They used to have a man at the gate.

"Q. You didn't make any record? · A. No, sir.

"Q. And didn't pass in at the gate and check in? A. I passed through the gate.

"Q. You did not check in? A. No, sir.

"Q.  When you came in or when you went out? A.  No, sir; none of the mill men did.

"Q.  None of the men you paid?  A.  None of the rolling mill men.

"Q.  Mr. Sturges, I believe you stated this—I want to be perfectly sure about it.  You collected the money from the company for the entire output of the three shifts, based on the ton?  A.  Yes, sir.

"Q.  And you paid out to the men their money for the three shifts, whether you worked on the shift or not?  A.  Except the heaters and roughers.

"Q.  What men were under your pay you paid that way?  A.  Yes, sir."

S. Y. High testified:

"Q.  Now, Mr. Sturges got a profit off of the work of all three shifts, did he not, of the rolls?  A.  I don't know what Mr. Sturges made on his rolls.

"Q.  Well, you paid Mr. Sturges a certain amount?  A.  He was paid a certain amount, per ton; yes.

"Q.  And then he paid for having the work done, out of that?  A.  Part of it; yes.

"Q.  And what he had left, after paying that, he kept?  A.  Why sure.

"Q.  Do you know how much was paid to Mr. Sturges, in any one year, for the amount of work that he did?

"Q.  Do you know?  A.  No, sir; I do not.

"Q.  Who paid him?  A.  He was paid from the office.

"Q.  Did you know anything about how much his compensation was?  A.  I did not.

"Q.  Did you ever inquire into how much he was getting for that work?  A.  No, sir.

"Q.  And how much his profits were over and above what he paid his rollers and stranners and finishers, and all those people he had to pay?  A.  I could

answer in this way, that they tried to find out how much he did make, and nobody could find out. That's all I know about it.''

Jacob Knapp testified:

''Q. Yes, you were employed by the company as a weigher for the company? A. Yes.

''Q. To receive this iron from the rollers, and weigh it? A. Yes, sir.

''Q. And there were two of you worked there—two shifts of weighers? A. Yes, one for day and one for night.

''Q. And there were three shifts of rollers, catchers and stranners and so forth? A. Yes.

''Q. And then this iron was brought up to you and you kept the weighing of each one of these shifts separate? A. Yes, sir.

''Q. Did you keep each heat separate? A. Yes.

''Q. And then you marked that up on a board, as required by the rules of the union? A. Yes, sir.

The uncontradicted evidence also showed appellant, the Kansas City Bolt & Nut Company, owned the entire plant and everything connected therewith where respondent was working at the time of his injury. It owned the plant, and furnished its own machinist to keep the same in repair, and furnished all the material that went into the output. The company also furnished everything in the way of tools and implements in use, and kept them in repair. Also furnished the engineer, fireman and all others who were necessary to furnish power, with which to run the entire plant. Also the appliances with which all the employees worked; and made all repairs in all departments, when called upon to do so.

Sturges, the codefendant, occupied the position of head roller, who employed respondent to work in the mill, after consultation with Superintendent High. The mill, at the time in question, was being operated

under a contract made between the Kansas City Bolt & Nut Company and the "Blue Valley Lodge," a labor organization of men employed or engaged in working in the rolling mills. There is no evidence in the case that Jewell belonged to Blue Valley Lodge. He states that he did not remember whether he had deposited his card in the Blue Valley Lodge after he came from Chicago where he had worked, but that he was a member of the amalgamated association, and Blue Valley Lodge was a branch of that association.

Upon the evidence before stated, counsel for appellant, insisted below, and requested the court to declare as a matter of law, that the relation of master and servant did not exist between it and the respondent, at the time of his injury, and for that reason, among others, he was not entitled to a recovery in this case.

In other words, the appellant insists that the Blue Valley Lodge No. 2 of the National Amalgamated Association of Iron Steel and Tin Workers, and Benjamin Sturges, the head roller, were at the time of the injury, independent contractors, and that the respondent was an employee of it, and not of appellant, and consequently, the relation of master and servant at said time did not exist between the appellant and the respondent, and for that reason the former was not liable to the latter for the injuries sustained by him.

The court refused that instruction, and submitted that question, by proper instructions, to the jury, who found it in the favor of the respondent.

When the case was here before, it was decided that the question of the relationship existing between the appellant and the respondent was one of fact, which should be submitted to the jury, under proper instructions from the court, provided the evidence upon that question was conflicting, which at that time we were unable to decide, for the reason that the contract under

which Sturges, the head roller, was working in the rolling mill, was not before the court.

The same question is urged upon our attention again; and if we correctly understand counsel for appellant, they do not challenge the correctness of the instructions submitting that question to the jury, except for the reason assigned, that there is no evidence upon which to base it.

At the second trial the contract between said association and the appellant was introduced in evidence, and is preserved in the record, which may be found set out in the statement of this case.

Conceding without deciding the question, that the contract means what counsel for appellant contends, namely, that the Blue Valley Lodge No. 2 of the National Amalgamated Association of Iron, Steel and Tin Workers, was an independent contractor for the production of the rods, bolts and nuts, mentioned in said contract, and that respondent was employed by and was working for the latter, and not for the former, at the time of his injury; nevertheless, the trial court, under the evidence, properly refused said instruction, for the reason that the uncontradicted evidence shows that the appellant company owned the entire plant, including the roller mill in question, furnished the place where the respondent worked, that it furnished the machinists to make the repairs and that it was its duty to keep the place and the instrumentalities with which he worked in repair, and that it furnished the engineers, firemen and all others who were necessary to generate the heat and power for the entire plant, the mill included. The uncontradicted evidence showed that the direct cause of the respondent's injury was the negligent failure of the appellant to furnish the stanchion post, mentioned in the evidence, and not from any negligence of Sturges or any one whom he represented.

In discussing this question in the former appeal in the case, 231 Mo. l. c. 195, the court said:

"In the case at bar, what was the proximate cause of the injury? Clearly it was the failure of the company to maintain the iron post described in the petition. If it had been there it would have been a physical impossibility for respondent to have sustained the injuries of which he complains. That being true, then the question presents itself, was the company negligent in failing to maintain the post at the place and in the manner stated in the petition? In order to properly determine this question we must consult the evidence bearing upon that question.

"It is undisputed that the appellant company owned the entire plant in question, and had exclusive control over every department thereof, including the rolling mills. That is (whatever may have been the relation that existed between the appellant company and Sturges, whether that of contractor or vice principal), the company had possession of and control over the building in which the mill was located, as well as the mill itself, including the engines, boilers and machinery connected therewith. The company also operated the entire plant, including the mill, and made all necessary repairs throughout all of the departments of the plant. Sturges and his assistants had nothing to do with those matters, except to manufacture the iron bars mentioned in the evidence in the building and on the mill which was thus owned, controlled and operated by the company; but, as previously stated, this record does not disclose whether Sturges was an independent contractor in doing that work or whether he was an employee and foreman of the company in charge of that work.

"Under this view of the case, the company undertaking to furnish and furnishing the place where and the instrumentalities with which the work was to be performed, the law imposed upon it the duty to exer-

cise ordinary care in seeing that the place where Sturges and his assistants were to work, and that the instrumentalities with which they were to labor, were reasonably safe for that purpose, even though it be conceded that Sturges was an independent contractor. This is true for the reason that if the owner undertakes to furnish the place and the appliances with which an independent contractor is to perform his contract, and retains possession and control over said place and appliances, then the contractor and his employees have the same right that an ordinary employee has to demand of the owner that they be reasonably safe for the purpose for which they were furnished. [Giesmann v. Missouri Edison El. Co., 173 Mo. 654; Ryan v. Railroad, 190 Mo. 621; Clark v. St. Louis & Suburban Ry. Co., 234 Mo. 396; Clark v. Union Iron & Foundry Co., 234 Mo. 436.] The last two cases are just handed down by this Division of the court, and are now pending in court in Banc. The precise question now under consideration was fully considered in the Clark case, and for that reason it is useless to further extend this discussion along that line.

"The only reason why the owner is not liable in damages for injuries sustained by an employee of an independent character is because the owner has no control over the actions of the contractor, whether they be negligent or not. But in the case at bar, as before stated, Sturges had no control over the place in which or the instrumentalities with which he was manufacturing the bars. And since it is practically undisputed that respondent was injured in consequence of the absence of the post, we may drop the question of independent contractor, and proceed to the consideration of the question, was it negligence on the part of the company to have failed to furnish and maintain the post in question?

"The petition alleged and the evidence of respondent tended to prove that the ordinary, usual and safe way to operate rolling mills, of this class while the process of 'repeating' was going on, was to have an iron post firmly set and maintained in the floor of the building in which the mill is located, some ten or twelve feet from the string of rolls, around which the bar was to pass in a semicircle, of sufficient strength to stop the movement of the bar whenever the end thereof should for any cause become caught in the rolls and thereby prevent the loop of the bar from catching the employees by the feet or legs and drawing them up against the framework of the rollers."

. By reading the contract before set out in the statement of the case, it will be seen that it does not materially change the nature of the case from what it was when previously here, for the evidence at the first trial showed, as it does here, that the appellant retained absolute possession and control of the entire plant, the rolling mill included; that it furnished the place for and the instrumentalities with which Sturges and his employees performed their duties, and that the appellant made all necessary repairs of every kind and description about the entire plant, the mill included; and also furnished the heat and power which was necessary to produce the manufactured articles mentioned in said contract. Sturges and those whom he represented, if any one, had nothing to do with, nor was he under any obligation to furnish the place where, or the instrumentalities with which, his employees did their work; nor was he or they under any legal obligation to keep those matters in repair. The evidence conclusively shows that those duties were reserved to the appellant, and were not imposed by contract or otherwise upon Sturges, except when he might be guilty of misfeasance, but in this case the jury found he was not guilty of misfeasance, but had he been, that fact would not have relieved the appellant of liability,

if its negligence had contributed with that of Sturges in producing the injury, much less can it escape liability where its negligence, as the evidence shows, was the sole cause of the injury.

The second trial of the case was conducted in harmony with the views of this court expressed in the former opinion.

Finding no error in the record, the judgment of the circuit court is affirmed.

## ON MOTION FOR REHEARING.

PER CURIAM.—Now at this day, November 26, 1912, the court having seen and fully understood the appellant's motion for a rehearing herein, doth order that said motion be and the same is hereby overruled on condition that plaintiff wthin ten days remit $5000 of his judgment as of the date of the verdict; otherwise, the motion will be sustained. *Woodson* and *Kennish, JJ.,* dissent.