Henry DANIEL, Plaintiff-Respondent,

v.

P. L. CHILDRESS, Defendant-Appellant.

No. 8263.

Springfield Court of Appeals.

Missouri.

Aug. 4, 1964.

Motion for Rehearing or Transfer Overruled Sept. 1, 1964.

Daniel, Clampett, Ellis, Rittershouse & Dalton, B. H. Clampett, Ransom A. Ellis, Jr., Springfield, for defendant-appellant.

Robert McPherson, Aurora, Robert Stemmons, Mt. Vernon, for plaintiff-respondent.

RUARK, Presiding Judge.

Plaintiff Henry Daniel came off second best in an encounter with a heifer calf and has secured judgment of four thousand dollars against defendant Childress, who now appeals. The suit arises out of an injury plaintiff received while assisting in a dehorning and vaccinating operation on defendant's farm. Plaintiff was herding, or urging, the calf down a chute or runway leading into the place of operation. The calf had other notions. The result—broken ribs and this suit.

Plaintiff, thirty-eight years old at the time (March 14, 1961), had handled cattle "all

my life" on his own farm. Such experience included the dehorning process. Defendant was engaged in a rather large farming operation which involved the purchase, feeding, and sale of cattle. There were times when he had from two to three hundred cattle on his place. Plaintiff had been employed by defendant for three and one-half years prior to the incident here involved. A part of his work involved the feeding and care of cattle. During this period he had also participated in the dehorning and vaccination processes on defendant's place.

Dehorning takes place during the period from November through March while there are no flies. In the dehorning and vaccination operation on defendant's farm, the cattle or calves are driven from the pen—one at a time—down a chute, runway, or alley to the dehorning chute or "veterinarian's squeeze tank." The chute, alley, or runway down which the cattle are driven consists of two parallel fences made of posts and plank. These side fences are four to four and one-half feet high. Along the inside of each are two "runners" or "stringers" (made of two-by-six lumber), nailed one above the other with several inches' space between. These stringers serve the purpose of keeping cattle which are coming down the runway from coming into contact with the upright posts of the side fences and also of permitting a person in the runway to step up on the fence and to get out of the runway to afford free passage to cattle coming down it. The inside measurement of the runway here in use was three and one-half to four feet. This runway chute was used on other occasions to direct cattle into a loading chute. But on this occasion the veterinarian's squeeze chute was placed at the east end. The open width of this squeeze chute is slightly less than that of the runway. It has a wooden floor and sides of metal bars or rods. It is so constructed that, when an animal enters, a gate can be dropped behind the victim, a stanchion will seize and hold it by the neck, and (by means of a lever) the metal bar sides can be squeezed in against the victim so as to hold it practically immobile while it is subjected to the indignity of dehorning, vaccination, or castration.

As stated, plaintiff had participated in this operation of dehorning and vaccinating during the three and one-half years he had worked for defendant. He was unable to say how many animals had been processed during the period he participated, but his witness Wardlow and others testified that during the period of his (plaintiff's) employment from five hundred to six hundred cows and calves were processed annually. In these dehorning operations four men had worked as a team, each doing the same job. Tennis, superintendent and foreman, and Jennings, an employee, worked at the squeeze chute. Tennis attended to vaccination and, if necessary, castration. Jennings used the dehorners. Plaintiff and his witness Wardlow were accustomed to drive the cattle from the pen down the runway to the squeeze chute. These two had worked together and always performed the same function.

On this occasion there were fifty, sixty, or perhaps seventy head of "run of the mill" whiteface Hereford calves in the pen to the west of the runway "to be run through." Approximately one-third of them (being yearlings) had horns. In the immediate instance, Wardlow had a group of these calves (five or six) bunched together at the entrance from the pen at the west end of the chute. From this group two calves came down the alley. Plaintiff stepped up on a stringer (on the side of the runway) and let the first one go by. Then he stepped down into the runway behind it so as to turn one back and drive the other into the squeeze chute. This animal, so being driven to the squeeze, was a (whiteface) heifer weighing about three hundred pounds. Plaintiff was right behind it with a stick in his hand, but he does not recall whether or not he struck it. The calf got to the squeeze chute and balked. Although there is evidence to the contrary from plaintiff's own witness, we must take that most favorable to the verdict; therefore,

we must assume, from plaintiff's testimony, that when the calf got to the squeeze chute it suddenly, and without warning, whirled or spun around and struck plaintiff in his right side. Plaintiff does not say what *part* of the heifer calf's body struck him, but his witness Wardlow testified that the animal struck him in the chest with its *shoulder* as it raced, or escaped back to join its fellows. This thrust, blow, lunge, or whatever it may be called pushed, drove, or threw plaintiff against the side fence and he sustained the injury complained of.

Plaintiff testified that although he had run cattle down through to the squeeze chute before, this was the first time an animal had ever suddenly turned and started back up the runway. He said that defendant's foreman, Tennis, had not warned him such would happen. He did say, however, that on previous occasions:

"Q. Is it not a fact that Mr. Wardlow would help you on some occasions get a calf to go into the squeeze chute if you had difficulty yourself getting him in there?

"A. Yes.

"Q. If you had a real stubborn calf that didn't want to go in, the two of you, Mr. Wardlow and yourself, would push that calf on in there, isn't that true?

"A. Yes."

Plaintiff said he was not familiar with this particular pen of calves which was the subject of operations that day. He didn't think that defendant had had them very long but was not sure just how long. His witness Wardlow said defendant had purchased them the previous December. There is no evidence that the animals in this lot were particularly vicious, wild, or more difficult to handle than the ordinary.

Defendant witness Tennis testified that there was nothing different that morning from the methods or process which had been followed on previous occasions in which plaintiff had participated. He testified that the use of the squeeze chute was the regular and ordinary way of carrying out that type of operation. He was not permitted (over objection by plaintiff) to testify as to whether it was the best method.

The grounds of recovery pleaded in the petition were that defendant failed to exercise ordinary care for plaintiff employee's safety in that (a) the defendant ordered and directed the plaintiff to enter into the chute pen (the runway) while cattle were being herded when defendant knew or should have known that the cattle would and could suddenly and without warning turn and crush plaintiff against the side of the chute pen (runway), and (b) the defendant failed to warn the plaintiff of the vicious character of the cattle being herded. The case was submitted on the theory that the defendant's foreman negligently ordered plaintiff to get into the runway chute and herd the cattle toward the squeeze chute when he knew or should have known that the cattle could and would, without warning, turn and strike plaintiff and crush him against the side of the runway.

There is no question that Tennis was defendant's vice principal. There is no dispute that plaintiff and his teammate Wardlow were that morning ordered to bring the calves up the runway to the squeeze chute. Plaintiff stated, in general terms, that Clovis Tennis (the foreman) told him to get into the chute and push (or run) the cattle through and that was all Tennis said about it. Wardlow testified that Tennis said "Wardlow, you and Henry (the plaintiff) put them in and drive them down to the —down to be dehorned, drive them down the chute." There is no evidence that Tennis gave any specific order or direction as to how this or any other particular calf was to be handled. The question raised by appellant's principal contention, reduced to its simplest terms, is: Did plaintiff make a submissible case of defendant's negligence in ordering plaintiff to drive the calves down the runway and, at least inferentially, to get into the runway in order to accomplish such end?

■ It is the duty of the master to use all reasonable means and precautions against injury to the employee which ordinary prudence and foresight would dictate in the light of the circumstances and existing knowledge. Huskey v. Heine Safety Boiler Co., 192 Mo.App. 370, 181 S.W. 1041, aff. Mo., 188 S.W. 101; Vaccaro v. City of St. Louis, Mo.App., 123 S.W.2d 230; Elmore v. Missouri Pac. R. Co., Mo., 301 S.W.2d 776; Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 300 S.W.2d 490. But the master is not an insurer of his employee. He is not liable for the *consequences* of danger, only that of his own (or vice principal's) *negligence*. In regard to the use of means and methods adopted to do the work, the best and safest method is not required. The test is whether the method used is that which has been found to be reasonably safe by ordinary usage and custom. Miller v. F. W. Woolworth Co., Mo., 328 S.W.2d 684; Schaum v. Southwestern Bell Telephone Co., 336 Mo. 228, 78 S.W.2d 439; Sweeney v. Terminal R. Ass'n of St. Louis, Mo.App., 110 S.W.2d 852; Emrick v. City of Springfield, Mo.App., 110 S.W.2d 840.

■ It must be recognized that practically all employments, indeed all human activities, involve some risk and danger; some more than others. The employee assumes the risk of injuries which are an ordinary incident of his employment. Sweeney v. Terminal R. Ass'n of St. Louis, supra; Pietraschke v. Pollnow, Mo.App., 147 S.W.2d 167; Mitchell v. Westport Hotel Operating Co., 225 Mo.App. 181, 19 S.W.2d 528; Schaum v. Southwestern Bell Telephone Co., supra. But he does not assume those risks (except those which are glaring, obvious, and threatening) which are the result of the employer's negligence. Jewell v. Kansas City Bolt & Nut Co., 231 Mo. 176, 132 S.W. 703; 245 Mo. 720, 151 S.W. 966; Morris v. Atlas Portland Cement Co., 323 Mo. 307, 19 S.W.2d 865; Davis v. City of Independence, 330 Mo. 201, 49 S.W.2d 95,

98; Huskey v. Heine Safety Boiler Co., supra.

The narrow question is whether or not the defendant (through his foreman Tennis) was negligent in directing the plaintiff to get into the runway and drive the calves up into the squeeze chute. It has been said that negligence of the employer should first be determined before the question of assumption of risk[1] is approached; but under the facts, circumstances, and state of the record in this case we find it unsatisfying to consider negligence of the master and assumption of risk of the employee separately, for the same facts determine both negligence and assumption of risk, and there is really only one question.

Usually "negligent order" cases involved pleaded and proven acts of negligence on the part of the employer which are precedent to or concurrent with the so-called negligent order. Thus, and to illustrate, in Jewell v. Kansas City Bolt & Nut Co., supra, there was pleaded and proven precedent and concurrent negligence in the failure to furnish a safe place to work, and in the furnishing of unfit materials and defective appliances. In Vaccaro v. City of St. Louis, supra, the employee was not furnished gloves to protect his hands. In Sweeney v. Terminal R. Ass'n of St. Louis, supra, the employer had permitted a greasy iron to lie in an uncustomary place.

There are cases, however, in which the "negligent order" is alone and of itself the basis of recovery—thus, where the employer orders the use of an unsafe method when a safe procedure is equally or reasonably available. This is illustrated in Huskey v. Heine Safety Boiler Co., supra. Another instance in which the order alone might suffice as negligence would be where the employer directs an inexperienced or incompetent employee to do a hazardous act even though the risk involved might be an ordinary incident of the work.

---

1. Or is it really contributory negligence. See Schaum v. Southwestern Bell Telephone Co., 336 Mo. 228, 78 S.W.2d 439.

The nearest approach to this case, on pleaded theory, which we have found is that of Mitchell v. Westport Hotel Operating Co., supra. There the petition was based on the order similar (in theory) to that in the case at hand. The order was, as here, "a direction to engage in the general work that was in progress." The court said that an experienced workman assumes all the risks ordinarily incident to the execution of an order, and 19 S.W.2d at 530:

"Unless there was some negligence on the part of the defendant in relation to the piling of the beams or the situation of the brace boards, or the like, plaintiff assumed the risk of the beams falling, by reason of the tendency of iron against iron to slide, and the falling over the brace boards by Smith. * * *"

"It may have been that the order of Smith, in his capacity as foreman, was to do a dangerous piece of work, but it is well settled that the mere fact that the work is dangerous does not constitute negligence on the part of the master where the danger arises by reason of the inherent nature of the work and the servant is not inexperienced. * * * Where danger is inherent in the work and known to the servant the master is guilty of no negligence and the servant assumes the risk."

■ Returning to the facts at hand: The plaintiff was no novice; he was an experienced farmer. He had handled cattle all his life, had engaged in his own dehorning operations, and in the previous dehorning operations, following the same methods, on the defendant's farm. He was bound to know, as all farmers know, that animals are not reasoning creatures and their handling necessarily involves some risk, increasing or decreasing according to the circumstances, which could involve, among other things, separation from the herd, strange surroundings, excitement, and the possible attempt to escape. This is a risk incident to that work. While the risk exists, we doubt that it is

any more hazardous or requires any more care and watchfulness than that required of and assumed by a servant who is ordered to drive a motor vehicle upon our crowded highways, or of one who is required to walk the dark streets of some of our crime-ridden cities. One is not entitled to a warning of that which is already known to him. As to extraordinary and unusual risk: There is no evidence that the method used in the process which the defendant followed was not the usual, ordinary, and accepted way of dehorning cattle, or that the method chosen was more hazardous than any other means known. We think that it is a matter of common knowledge in rural Missouri that chutes, chute pens, or runways are commonly used on farms, stockyards, and other places where it is necessary to handle, direct, and control large numbers of cattle. Cattle are animals, the dehorning process is painful, and they do not submit to it peacefully. (See Moore v. Stokes, Mo.App., 286 S.W.2d 835.) The operation requires their temporary confinement and partial immobilization. In order to secure this (unless they are educated to separation from the herd and to confinement) they must be driven, pulled, or pushed into the place of confinement; and this must be done whether or not they protest, balk, dodge, run, or otherwise attempt to escape or return to the herd. It has not been intimated how any method would have accomplished this more safely than by driving them down the runway chute into the squeeze chute as was here done. Nor is there any evidence by which the defendant is to be charged with knowledge that the situation which involved the heifer calf involved any extraordinary hazard. The owner of a bull is not to be charged with notice that it is vicious until he has reason to know (Alexander v. Crotchett, 233 Mo.App. 674, 124 S.W.2d 534), and the same applies to a master requiring a servant to round up and enclose a Texas steer (Clark v. Missouri, K. & T. R. Co., 179 Mo. 66, 77 S.W. 882). There is no evidence that defendant knew this animal was any more likely to attempt escape than any other. Nor was he required to assume that this

whiteface calf, being the female of the species, was more deadly than the male and inherently vicious; and the evidence does not show that she was. Factually the case is quite similar to Rosedoff v. Consolidated Rendering Co., 94 N.H. 114, 47 A.2d 574, in which it was held that the plaintiff assumed the risk of driving a cow (which turned on him) down the runway.

We do not find facts from which it can be determined that defendant was negligent in ordering the plaintiff to do what he had previously done and was doing in this case, and we believe the plaintiff assumed the risk incident to his doing it. Any other holding would have the effect of making the farmer practically the insurer of all employees who have anything to do with animals. It thus appears to us that plaintiff did not make a submissible case of liability, and the judgment must therefore be reversed. It is so ordered.

STONE and HOGAN, JJ., concur.