EARL DAVIS v. CITY OF INDEPENDENCE, a Municipal Corporation, Appellant.—49 S. W. (2d) 95.

Division Two, April 8, 1932.

*John F. Thice* and *L. T. Dryden* for appellant.

*E. C. Hamilton* for respondent.

FITZSIMMONS, C.—This is an action for damages for personal injuries sustained by respondent while he was in the service of appellant, a municipal corporation. In the course of his employment, respondent, a lineman, climbed an electric light pole owned by appellant for the purpose of transferring wires from it to an adjacent pole. That pole to which respondent was clinging in the performance of his work broke off at the base and fell, respondent going down with it. Respondent recovered judgment for $15,000, and appellant appealed to this court.

It was undisputed that the pole which fell with respondent showed upon examination after the fall that it was rotten at the base. The pole was in position at the northeast corner of Fair Avenue and Noland Street in Independence When respondent ascended the pole there were near the top of it at right angles to each other two cross arms to which were attached wires running north and south and east and west respectively. When the crew of linemen reached the

corner stated, the foreman, Jim Wells, gave the general order to transfer the wires from the one pole to the other. Two linemen who were the first to get on their climbing spurs and safety belts ascended the pole to which the wires were to be transferred. Respondent whose equipment had been beneath that of his fellow workmen in a box in the truck of the crew, outfitted himself with safety belt, climbers and tools and climbed the pole from which the wires were to be detached. It was essential that a man or men ascend both poles in order to carry out the foreman's directions to his crew to transfer the wires. Respondent and the two men on the other pole were the only linemen in the crew except Wells, the foreman. They and respondent were first-class linemen of some years experience and the only ones qualified to go aloft. The top of the old pole which respondent ascended was approximately 28 or 30 feet from the ground. The other pole to which the wires were to be transferred was five or six feet higher. The foreman, Wells, stood below and watched the work of his men aloft and also of two ground men who did the tasks of helpers. Wells at all times was about twenty feet from the foot of the pole upon which respondent was working.

On his own behalf respondent testified that according to custom he climbed the pole about ten feet and shook it to determine its stability. It gave no sign of weakness. He then climbed to the top, adjusted his safety belt and worked there several hours. The day was cold and the ground was frozen and covered with snow. Respondent, in the performance of his part of the work of transfer, removed all except two or three of the wires fixed to the cross-arms of the old pole, spliced them with additional wire to give the wires a greater length needed upon the new pole, and passed the wires to his fellow workmen upon the nearby pole by means of a hand line. Respondent then descended the pole half way and, according to his own testimony, he inquired of the foreman Wells: "Do you want to strip this pole?" The foreman answered: "Yes, we have time. Go back up and take off the remaining wires." Respondent next asked the foreman whether the pole was safe. To this question, according to respondent, Wells answered: "Sure, I set that pole when we built the Rock Line." Testimony for both respondent and appellant made it obvious that wire-carrying poles are guyed and made more secure by the attached wires and, especially when, as in this case, the wires ran in four directions. Respondent further testified that upon the assurance given by the foreman and with his knowledge that the Rock Line had been built only three years, he ascended the pole again to the cross-arm to which the remaining three wires were affixed.

He cut one or two of these wires and was in an upright position at the level of the cross-arm with his climbing spurs sunk into the pole and his body leaning against his safety belt which encircled the pole when the pole broke off at its base and fell to the ground carrying

respondent with it in a northeasterly direction. According to respondent and other witnesses who testified on his behalf, respondent was on the under side of the pole when it fell, held to it by his safety belt and by his spurs. The pole, upon striking the ground, fell upon him the full length of his body over his right side and across the right side of his head and h's face. The pole rebounded and when it settled again to the ground the testimony on behalf of respondent was to the effect that he was clear of it, but was still held by his belt and imbedded spurs. He was released from the pole by his fellow workmen and was taken to the office of the city physician for treatment. Respondent also testified that it was the custom in the city light department of appellant for the foreman in charge of a crew of linemen to test poles which were to be stripped of wires by sounding them near the base with pointed iron bars and also by digging about such poles for a distance of six inches or more from the surface of the ground, for the purpose of examination of the wood. It was testified also that such poles, if found to be of doubtful safety, were sustained by means of upstanding pikes and also by means of supporting ropes affixed to a nearby pole and that all of this precautionary work was the duty of the foreman.

On behalf of appellant, the foreman, Jim Wells, denied the conversation with respondent respecting the safety of the pole and Wells' assurance that it was "safe" as he had set it. The two linemen who were upon the other pole testified they did not hear any such conversation between respondent and Wells. Several other witnesses confirmed respondent's version of the conversation. · The two other linemen and Wells also denied that it was the duty and the custom of foremen to test poles for safety. They testified that it was the practice for the lineman ascending a pole to make all necessary and proper tests for his own safety, practicularly when the pole was to be stripped of wires. They also testified that when the pole fell and hit the ground and also when it rebounded, respondent was on top of and not underneath the pole. The trial lasted eight days and the record contains over a thousand pages. It follows as of course that there are many assignments of error. In the examination of some of these there will be a further narrative of facts.

Respondent in his petition stated as specifications of negligence that appellant failed to use ordinary care to provide and maintain a reasonably safe place to work; that the place (i. e., the old pole) was unsafe and dangerous; that the foreman negligently failed to inspect the pole to ascertain its stability and safety before ordering plaintiff to ascend, although the pole was rotten at the base, a fact which the foreman knew or could have known by the use of ordinary care; that appellant was also negligent in failing to prop up the pole with pikes or to tie it up. Respondent also set up as a further ground of negligence the inquiry of respondent whether the pole was safe

if stripped of wires and the assurance of the foreman that it was safe. Appellant in its answer admitted that it was a municipal corporation and denied all other allegations of the petition. As affirmative defenses, appellant pleaded in its answer that under the terms of his employment it was the duty of respondent to inspect poles before climbing them and to make a pole reasonably safe and secure, in case that, upon his inspection he should find it to be unsafe to climb by reason of decay or rot or otherwise, and that respondent by these terms of his employment assumed the risk of poles becoming old and unsafe for climbing. Appellant also pleaded contributory negligence of respondent in that he failed to inspect the pole, as was his duty, before removing all the wires therefrom, which failure on his part resulted in his fall. The reply was a general denial of all allegations of the answer except the admission of appellant's corporate existence.

I. Appellant complains that the trial court erred in overruling its demurrers to the evidence. The reasons given by appellant are: "(a) Because no negligence was shown by respondent upon the part of appellant. The pole apparently was sound and reasonably safe until respondent by his own act loosened all the wires and made it thereby unsafe and caused it to fall. (b) Because the evidence showed respondent guilty of contributory negligence as a matter of law. 1. Because it was respondent's duty to inspect and determine whether the pole was reasonably safe, which he failed to do. 2. Because respondent failed to use the appliances at hand for the purpose of rendering the pole safe by propping the same or digging about it to ascertain whether it was safe. 3. Because his own acts in removing all the wires rendered the pole unsafe and caused it to fall. (c) Because the falling of the electric light pole with respondent was a danger incident to his work and employment, and was a risk which the respondent assumed as an employee of appellant."

This contention is without merit. Wells, the foreman, testified that he received orders from his superior to transfer the city's wires from its own pole (the one which later fell) to the adjacent newer pole of the telephone company. And so, after lunch, he went with his men to the corner of Fair Avenue and Noland Street and "I told the men that we had this pole to transfer." He did not tell this to any particular man, and he did not give any other directions particularly. "Q. What do you mean by not particularly? A. Why, no, there was not—I simply told the men that we had to transfer this pole. They really knowed—the linemen knowed that the pole was to be transferred and what was to be done after I had given them the instructions." This was upon direct examination by counsel for appellant. Wells denied the testimony of respondent

that he (respondent) shook the pole by way of test, when he ascended about ten feet. But on cross-examination he testified he did not remember whether respondent so tested the pole. But Wells made it clear that such a test would have been of no avail, for on re-direct examination by counsel for appellant, Wells testified:

"Q. Mr. Wells, in answer to a question of Mr. Hamilton, relative to the question as to whether or not the pole would have indicated that it was broken off, if it had been struck with a bar or hammer, and I believe your answer was that it would not show it—will you please tell us why? A. In that particular case, it would not.

"Q. Why, Mr. Wells? A. For the simple reason that it was—the pole was off all right—it was broken off—that pole was broken off and there was, say, six inches of snow on the ground and it was also frozen at the time, and generally, a pole is generally about two inches —in that case—that particular pole—there was dry rot in that pole —and it was frozen down from the water and snow—and it would not have shown any signs in case of shaking it, nor would not have shown that it was rotted off at all."

In legal effect, Wells, by his own testimony, ordered respondent to climb the pole which later fell with him. A master owes to his servant the duty of furnishing him a reasonably safe place in which to work, and also reasonably safe and suitable appliances with which to do his work. ▆ The servant assumes the risks that are ordinarily incident to and inherent in the work itself. [Haviland v. Railway Co., 172 Mo. 1. c. 112, 72 S. W. 515.] ▆ But the servant does not assume risks of his employment that are caused by the master's negligence. [Williams v. Pryor, 272 Mo. 613, 200 S. W. 53; Tull v. Railway Co. (Mo. App.), 216 S. W. 572.] And, unless the danger or risk occasioned by the master's negligence is so glaring and obviously apparent to the servant as to threaten immediate and almost certain danger, then the servant neither assumes the risk nor can be held guilty of contributory negligence as a matter of law. [Thorpe v. Railway Co., 89 Mo. 650, 2 S. W. 3, 58 Am. Rep. 120; Patrum v. Railroad Co., 259 Mo. 109, 168 S. W. 662; Bowman v. Electric Light Co. (Mo. App.), 213 S. W. 161; Hunter v. Busy Bee Candy Co., 271 S. W. 800.]

Appellant relies upon Roberts v. Missouri and Kansas Telephone Co., 166 Mo. 370, 66 S. W. 155, wherein this court reversed an order of the trial court setting aside a judgment of nonsuit. But that case is not in point. Plaintiff there and a fellow lineman were engaged in repairing a telephone line. They tightened wires and replaced defective pins and cross-arms, and while they were so doing a rotten cross-arm upon which plaintiff was standing broke under him, and he fell. There was not in the Roberts case, as in the case at bar, a foreman on the ground overseeing the work. "His (Rob-

erts') knowledge and means of knowing the condition of the cross-arm was not only equal but superior to the knowledge and means of knowledge of its condition by the master. He was on the spot; the master was in town in the office.'' A further sharp distinction between the instant case and the Roberts case is thus pointed out in the Roberts case:

''There is not a particle of evidence in this record to sustain the allegation of the petition that the work was being done under the direction of defendant's foreman, or of any superior officer. The plaintiff and Gates were alone and were sent to repair the line and fix it up. They were left free to adopt what measures they saw fit to accomplish the purpose.. Neither is there any evidence to support the contention of the plaintiff, that his duties as a lineman did not require him to examine or inspect the cross-arms to see if they were safe before he rested his weight to them. On the contrary, whether such duties ordinarily attach to the business of a lineman or not, the plaintiff in the performance of the work of repairing and fixing up the line, was expected to and did inspect and repair the whole line, the poles, cross-arms and pins as well as the wires, and his testimony shows that he so understood it. . . . The plaintiff, therefore, was not only acting as a lineman, but was also an inspector as to this work. He was engaged in the work of repairing the line. . . . This case is clearly distinguishable from the cases cited and relied on by the plaintiff, in this, that in those cases the servant injured was not charged with the duty of ascertaining and repairing the defects in the appliances, but was using appliances furnished him by the master for use in the ordinary course of his employment, while in this case the plaintiff was charged with the duty and engaged in the work of inspecting and repairing the master's appliances.''

▮ Respondent here, when the pole fell with him, ''was not charged with the duty of ascertaining and repairing the defects in the appliances but was using appliances furnished him by the master for use in the ordinary course of his employment.''

The demurrer in this case is governed by the law stated by the Kansas City Court of Appeals in the case of Bradford v. City of St. Joseph, 214 S. W. 281, and restated by the Supreme Court en Banc in State ex rel. City of St. Joseph v. Ellison et al., 223 S. W. 671, in which this court quashed its preliminary writ of *certiorari* directed at the opinion of the Court of Appeals in the Bradford case. In that case, as here, a pole, which proved to be rotten, fell, and plaintiff, a lineman, employed by defendant and performing his assigned duties of transferring wires near the top of the pole, went down with it and was injured. The Kansas City Court of Appeals held (214 S. W. 281, l. c. 282):

■ "There is no question but that it was the foreman's duty, and not the plaintiff's to inspect the pole to ascertain its condition."

■ The dry rot in the pole in question here could not have been observed by respondent by shaking the pole, as foreman Wells testified, because the pole was held fast by the snow and the frozen ground. But that fact did not relieve appellant of the duty (if the jury should find it was its duty) either of ascertaining the true condition of the pole by digging away the snow and enough of the ground to make a subsurface test of the pole, or, in the alternative, of deferring the transfer of the wires until changed weather conditions made more easy the task of sounding the pole below the ground. Under the pleadings and the evidence it was a submissible question whether it was the duty of respondent or of appellant to inspect the pole before respondent placed himself in a position of peril. The demurrer was properly overruled.

■ II. Dr. Krimminger, respondent's family and attending physician, testified on April 3, 1929, the first day of the trial, that the pole falling upon the body of respondent might or could have produced, among other internal injuries, a duodenal ulcer. Respondent, on April 10, 1929, the sixth day of the trial, at the close of plaintiff's case requested the court to say to the jury that all the evidence with relation to a duodenal ulcer was voluntarily withdrawn and the jury instructed not to consider it for any purpose whatever. Thereupon appellant moved the court to discharge the jury because the evidence touching a duodenal ulcer was highly prejudicial. The court overruled this motion and respondent later read to the jury a transcript of the testimony about a duodenal ulcer which testimony, upon respondent's motion, was stricken out and the jury was instructed to disregard it. Appellant assigns as error the action of the court, in admitting, over objection, testimony about an ulcer, and in overruling the motion to discharge the jury. The record does not disclose any objection made by appellant at the time to the admission of the testimony of Dr. Krimminger about an ulcer. At the close of this phase of the doctor's testimony, appellant moved to strike it out because injury to the duodenum by the fall of the pole had not been pleaded. The court overruled this motion, but upon its own motion the court struck out all the testimony of the doctor touching danger of perforation of the duodenum as not being within the allegations of the petition. The assignment of error founded upon the admission by the trial court of testimony of the doctor about a possible ulcer cannot be considered here since appellant did not object to any of the series of questions which elicited this testimony. And of course, the motion of appellant, offered six days after the admission of the objectionable tes-

timony to discharge the jury on account of its prejudicial character was out of time even if it had merit. This assignment of error is ruled against appellant.

III. It is orderly at this point to say more about the testimony leading up to the mention of a duodenal ulcer in order to dispose of other somewhat kindred assignments of error. Respondent testified that on the evening of the day he fell with the pole, January 2, 1925, he had a passage of blood from the bowels, that he had a like hemorrhage the next morning, and that he had these flows of blood periodically about every ten days up to the time of an exploratory operation which Dr. John R. Greene, a surgeon called in by Dr. Krimminger, performed in October, 1927, two years and nearly ten months after the accident. Following the operation and while respondent was in hospital and later while he was recuperating at home, he was free from the hemorrhages, he testified. But when he resumed work, he said, the hemorrhages returned and he was afflicted with them to the time of the trial.

Several hundred pages of the record are filled with the testimony of physicians, surgeons, consultants and X-ray experts. Some of these on behalf of respondent testified that the hemorrhages might and could have been caused by a trauma or wound in the abdominal region, produced by the pole falling, as respondent and his witness testified, lengthwise of his body along the right side. Dr. Krimminger was one of these and in the course of his testimony he ventured the opinion of a possible duodenal ulcer as another result of the trauma caused by the falling pole.

Others on behalf of appellant testified that, in their professional judgment the hemorrhages were not due to the accident but to other causes. Dr. Greene, the surgeon, in his report of the exploratory operation, made for the purpose of finding the cause and a cure for the hemorrhages, noted that respondent had sub-acute appendicitis and chronic peritonitis. He also noted that a congenital (i. e. from birth) failure of rotation of the cecum and colon were in evidence. Appellant's experts seized upon this last disclosure as ground for the opinion that respondent's hemorrhages were due to the fact that respondent had a "cecum mobile," that is, a predisposition from birth of a part of his bowels called the cecum to move about and to take on abnormal positions when it should be stationary. They testified that a cecum mobile was marked by symptoms very similar to appendicitis, and that sometimes surgeons, making a wrong diagnosis, operated for appendicitis upon persons having a cecum mobile, to the discredit of surgery and of themselves, for in such cases the pains and symptoms return after the appendix is removed. Appellant's expert witnesses saw in the recurrence of respondent's pains

and hemorrhages after the operation evidence that he had a cecum mobile.

Appellant predicates several assignments of error upon these surgical and medical phases of the case. It claims that the court erred in admitting evidence of the operation and in overruling appellant's motion to strike out this evidence because it was not shown that the operation was necessary; because it was not shown that the accident was the cause of the conditions which induced the operation, and because it was not shown whether the operation was made necessary by respondent's neglect to get timely treatment for his ailments. Further errors assigned are that the trial court overruled appellant's motions at the close of the whole case to strike out all evidence as to abnormal conditions found in respondent's abdominal organs at the time of the operation, to strike out all evidence of hemorrhages and to discharge the jury from further consideration of the cause for the reason that testimony about the abnormal conditions and the hemorrhages had been admitted.

Respondent, in his petition alleged that as a direct result of the accident, he sustained internal injuries in the lower abdominal region, that his intestines were smashed and were caused to anchor themselves together with the appendix to the wall of the pelvis causing peritonitis; that as a necessary measure to alleviate these injuries he was forced to undergo a major abdominal operation. The hemorrhages were also described in the petition as a direct result of the accident and injuries. Whether the hemorrhages in fact existed, and if so, whether they were caused by the accident and whether the chronic peritonitis and sub-acute appendicitis were the result of the fall, and whether the other internal disorders were facts, and if so, whether they were due to the accident were issues raised by the pleadings, controverted by much conflicting testimony, and properly submissible to the jury. Dr. Krimminger testified that as a result of a consultation between himself, Dr. Greene and Dr. Crandall, the official city physician of appellant, it was their judgment that an exploratory operation should be performed in order to diagnose the cause of the hemorrhages. These several assignments of error are accordingly ruled against appellant.

IV. Appellant predicates nine assignments of error upon that many instructions given or refused. Respondent's instruction ''P Instruction No. 9,'' relates to the opinion testimony of experts and is as follows:

''The court instructs the jury that you are not bound to accept as true the opinions of expert witnesses, but the jury may give the opinions of expert witnesses such weight as the jury under all the evidence in the case consider them entitled to, or the jury may al-

together disregard such opinions, if the jury from all the facts believe such opinions to be unreasonable. Such opinions neither establish, nor tend to establish, the truth of the facts upon which they are based, and, whether or not the matters testified to by such expert witnesses as facts, are true or false, is to be determined by the jury alone.'' Five physicans, surgeons and X-ray specialists testified on behalf of respondent and six of the same groups of professional men appeared for appellant. Over twenty X-ray plates of different parts of respondent's head and body were offered, some by respondent and some by appellant. All the medical men testified concerning these plates and interpreted them to the jury. The Roentgenologists in particular gave fact testimony about these plates and their meaning with respect to respondent's injuries and the consequences ascribed to these injuries. The doctors also used the pelvis bone of a human skeleton to illustrate some of their testimony. At least one of the medical men, called by appellant, had, in his capacity as city physician, treated respondent professionally. Two of appellant's witnesses testified concerning a physical examination which they had made of respondent. The testimony of these three professional witnesses, called by appellant, was partly of facts and partly expressions of opinion. Three of appellant's six professional witnesses neither treated nor examined respondent. While most of the testimony of these three witnesses was of an opinionative nature and in answer to hypothetical questions, at least some of the testimony of each of them was concerning the X-ray pictures. Of respondent's five professional witnesses at least three had treated him or had operated on him and all of these gave opinions as well as facts. The testimony of all witnesses fills 1003 pages of the record. And of this space 448 pages are given to the testimony of the medical men and the record of the exhibits. Under this state of the record the instruction on expert witnesses is more erroneous than was a like instruction in the case of Spencer v. Quincy, O. & K. C. Ry. Co. (Mo. Sup.), 317 Mo. 492, 297 S. W. 353. This court in its opinion in that case said:

''This instruction was taken bodily from Smith v. Telephone Co., 113 Mo. App. 443, 87 S. W. 71, where it had the unqualified approval of the Kansas City Court of Appeals. Nevertheless, it was erroneous, at least as applicable to the evidence in this case. There were some five or six medical experts who testified with respect to plaintiff's injuries—torn or strained ligaments and fractured bones at or just above the ankle joint. They had made physical examinations and they had 'read' X-ray pictures, and from both had diagnosed the conditions of the injured parts. Their testimony consisted of a mixture of facts they had observed and the inferences they had drawn from those facts. Neither a skilled lawyer nor a trained

psychologist, much less a jury of laymen, could have separated with any sort of precision the fact testimony of these experts from their opinion testimony."

But in the Spencer case, a similar instruction was given at the request of the defendant, and the court held that, the error being common to both parties, the defendant was not in a position to complain of it. That situation does not exist here.

Respondent sensing the error of this instruction, takes refuge, as respondents sometimes do, in the plea that the verdict was for the right party and that this court should not reverse the case on a mere technicality. Major issues in the case were whether the hemorrhages of which respondent complained were caused by the injuries which he received or were due to organic disorders, arising in the course of nature; whether his frontal bone had been fractured; whether a sliver of bone had worked its way out from an elbow, alleged to have been fractured, and other questions going to the nature and extent of respondent's injuries. Error in an instruction to the jury on the subject of the testimony of experts covering these phases of the case cannot be said to be "a mere technicality." This court ruled in Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84, l. c. 95, that "an opinion, when not a mere guess or conjecture but an inference drawn by one of requisite experiential capacity from adequate data is evidence." It also ruled that, under the facts in that case, the error in the instruction on expert witnesses materially affected the merits of the action. The instruction in the instant case is as erroneous as were the instructions in the Spencer and Scanlon cases. And under the issues here raised the instruction is highly prejudicial. It was calculated to cast the jurors into a river of doubt about a mass of testimony which took up nearly half the record, and left them to their own devices to reach certain and sure ground.

V. Instruction P 3, given by the court at the request of respondent, advised the jury in substance that, even though respondent knew, or, by the exercise of ordinary care he could have known that his position on the pole was not a safe one, yet this should not defeat his right of recovery if the jury found and believed that defendant's foreman negligently directed him to go into the position of danger and that the danger was not of such a glaring and dangerous nature as to threaten immediate injury. Appellant complains that this instruction is erroneous because it did not submit to the jury the questions of respondent's contributory negligence and his assumption of risk, and did not require respondent to prove his case by a preponderance of the evidence. The instruction, standing alone, is subject to the criticism that it is too narrow in scope. But whatever faults or short-comings there may have been in Instruction P 3 were cured by instructions DC3 and DC4, covering the issues

of contributory negligence and assumption of risk respectively. These two last mentioned instructions were appellant's instructions D3 and D4, modified by the court. The error complained of was further remedied by instructions which court gave of its own motion. This assignment is ruled against appellant.

VI. Appellant complains of certain parts of the instruction on the measure of damages. That instruction in abbreviated form is as follows:

"The court instructs the jury that if from all the evidence in the case your finding be for the plaintiff, you should, in arriving at your verdict, take into consideration the following: . . .

"2nd. The nature, character and extent of plaintiff's mental derangement, if any, caused by and directly resulting from the negligence, if any, as mentioned in other instructions, on the part of the defendant City, or its foreman, Wells. . . .

"6th. The amount, if any, reasonably and necessarily expended, or for which plaintiff has become obligated, for medical and surgical attention, hospital bills and nursing, if any, necessitated by the injuries sustained, if any, occasioned by said negligence, if any."

Appellant objects that the second subdivision of the instruction is a comment upon the evidence and gives undue prominence to "mental derangement" as an element of damages. The criticism is without merit. The instruction consists of six subdivisions, covering the pleaded specifications of damages namely (1) physical injuries, (2) mental derangement. (3) pain of body and mind suffered, (4) pain of body and mind to be suffered in the future, (5) loss of earning capacity, (6) amount expended for medical and surgical attention. No one element of pleaded damages is unduly stressed or offends against the rule forbidding comments on the evidence.

The sixth subdivision of the instruction on the measure of damages does not limit the amount of recovery for medical and surgical attention, hospital bills and nursing to the amount of these items pleaded in the petition namely $496.15. In the view which we take of the case, we are not called upon to say whether this is reversible error. The amount of expenses pleaded was supported by evidence. No necessary future expenses was either pleaded or proved. The jury, in the absence of a proper instruction, was not left to guess work to the same degree as in other cases. But the omission of a limitation of recovery for expenses to the amount pleaded is error, and should be corrected in a re-trial.

VII. Instruction C-1, given by the court of its own motion, was in the nature of a main instruction predicated upon the duty of appellant to furnish to respondent a reasonably safe place to work,

218

and upon the failure of foreman Wells to perform his alleged duty to inspect the pole before respondent climbed it. In this instruction occurs the following.: "And if the jury further find from the evidence that Wells failed to inspect or cause the inspection of said light pole and that he did direct that either plaintiff or some other member of the gang go up said pole and remove the wires therefrom." Respondent's petition alleges: "That at said time and place he was ordered by the defendant's foreman, James Wells, to ascend a pole carrying wires, etc." Appellant argues that the instruction makes appellant liable whether the foreman directed respondent or some one else to go up the pole; that the instruction enlarges the issues, and that appellant would not be liable in this case to respondent for some wrongful direction which the foreman gave to some one else. If there was in the record testimony on behalf of respondent that the foreman directed respondent to climb the pole and also testimony on behalf of appellant that the foreman told some one else to go up, the objection would be sound. But the evidence for respondent and appellant is undisputed that, when the crew arrived at the site of the pole, the foreman gave the general direction that the city wires were to be transferred from the city's pole to the telephone pole; that there were in the crew only three first class linemen whose duty it was to climb poles; that respondent was one of these; that the other first class linemen, Harold Welch and Walter Williams, were the first to equip themselves for climbing and that they ascended the telephone pole; that it was necessary for a lineman to be on the city's pole to detach and hand over to the other men the wires to be transferred and that, under the general order. respondent climbed the city's pole. As Wells testified: "The linemen knowed that the pole was to be transferred and what was to be done after I had given them the instructions " In view of this state of the case the alternative language of the instruction should not be ruled to be reversible error for the reasons stated by appellant. But the phrase: "And that he did direct that either plaintiff or some other member of the gang go up said pole," is unhappy, awkward and somewhat ambiguous. It should be avoided at another trial.

VIII. Appellant assigns as error the refusal of the court to give appellant's Instruction D3, on respondent's contributory negligence and D4 hypothesizing the assumption of risk. The court modified appellant's Instruction D3, requiring the jury to find for appellant, if respondent was guilty of contributory negligence, by adding this clause: "Unless you find, as explained in other instructions herein, that Wells assured plaintiff after the the latter had gone up the pole and taken off some of the wires that the pole was safe and then directed him to go back up the pole and strip it of all the wires."

Thus modified, Instruction D3 was given as Instruction DC3. We find no error in that modification under the law applicable to the facts of this case. In like manner the court modified appellant's Instruction D4 on the assumption of risk, by adding: "unless you find that defendant was guilty of negligence, as explained in other instructions, given herein, for the reason that plaintiff assumed no danger caused by defendant's negligence, if any." In this modified form the court gave Instruction D4 as DC4. The addition is a proper statement of elementary law. These assignments therefore are ruled against appellant.

IX. Appellant insists that the amount of the verdict, $15,000, is excessive. In view of our opinion that there should be a retrial for other reasons, we need not rule upon this assignment. But it may be observed that the gist of appellant's argument in support of the charge of an excessive verdict is that he drew wages from the city of Independence and later from Jackson County during much of the time elapsing from the date of his injury to the date of filing suit. It is a fair inference from the record that respondent was kept upon the public payroll partly out of sympathy and partly by political favor. He quit working for appellant immediately after an election and change of administration and he went to work for the county. He lost his employment with the county after another election and he took up electrical repair work. His labors, after his injuries, were not strenuous. At least this line of attack upon the amount of the verdict is not effective.

X. For the error of the court in giving on behalf of respondent Instruction P9, relating to opinions of expert witnesses, the judgment is reversed and the cause remanded. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.