JAMES JENKINS, DEFENDANT IN ERROR, v. KANSAS CITY, MISSOURI, PLAINTIFF IN ERROR.—91 S. W. (2d) 98.

Kansas City Court of Appeals. January 27, 1936.

338

*William T. Alford, Mont T. Prewitt* and *E. E. Thompson* for defendant in error.

*George E. Kingsley,* City Counselor, *Francis L. Roach* and *Marcy K. Brown, Jr.* for plaintiff in error.

BLAND, J.—This is a suit for damages for personal injuries. Defendant in error recovered a verdict and judgment in the sum of $3000, and plaintiff in error has brought the cause here by writ of error. For convenience we will refer to the parties as they appeared in the trial court, that is, defendant in error will be called the plaintiff and plaintiff in error the defendant.

The case was pleaded and tried by the plaintiff upon the *res ipsa loquitur* theory. The sole point raised by the defendant is that the court should have sustained its demurrer to the evidence, for the reason that the case is not one where the *res ipsa loquitur* theory is admissible. This will require a statement of the evidence in its most favorable light to the plaintiff.

The facts show that plaintiff lost three fingers of his right hand, and sustained an injury to the others of that hand, by reason of the unexpected starting of a machine, known as a back-filler, being operated by him as an employee of the defendant. When the machine started plaintiff's hand was under a chain thereon, causing the chain to drag it into a sprocket wheel.

The evidence shows that the back-filler in question moved about from place to place on caterpillars. It was "used for filling up trenches with dirt and pulling the dirt away" thrown up in the excavation of trenches. The operator's seat was located to the rear of the machine

and faced the machinery. A gasoline motor, which operated the machine, was several feet in front of the seat. To the right of the seat, and upwards of three or four feet in front thereof, and immediately to the rear of the motor and between it and the seat, was a housing containing the clutch. (The evidence of plaintiff tends to show that the machine started up by reason of some defect in the clutch.) The greater part of the remainder of the machinery was to the left of the motor and the clutch housing. The clutch was of the multiple disc type with dry plates. There were two of these plates which were spaced about 1/16 of an inch apart and were operated by friction. The machine had no transmission, making it a direct drive type. The motor was started by the operator going to the front and cranking it; but before doing so he would pull back upon a vertical lever attached to the frame at the seat and extending somewhat above it and to the right thereof. To this lever was attached, at about its center, a horizontal iron bar about an inch in diameter which extended from the lever to the clutch housing, where by means of another rod or rods it was attached to the clutch. The clutch was disengaged by pulling the lever back about eight or ten inches and engaged by pushing it forward. It was necessary to have the clutch disengaged before the motor could be started. Near that end of the clutch housing towards the driver's seat was a small wheel with cogs, described as a sprocket wheel, which was five or six inches in circumference. This wheel was mounted on a shaft which, by various mechanisms, was attached to the clutch. To the left of this wheel was a larger sprocket wheel and the two were connected by a chain of links about an inch wide and about five feet long. The power from the motor was transmitted through the clutch to the machinery by means of the sprocket chain. There were several other levers situated in front of the driver's seat controlling the various movements of the machine, to make it go forward or backward and to raise and lower a boom and manipulate a large shovel.

In order to engage the clutch, and thus start the small sprocket wheel and chain in operation, it was necessary, after the motor was revolving, to do nothing more than to shove forward, for about eight or ten inches, the horizontal lever that we have described. This caused the clutch to engage and the various mechanisms that operated the shaft to be set in motion and the small sprocket wheel on the shaft to turn resulting in the movement of the chain and the large sprocket wheel.

The back-filler was not owned by the city but had been rented from its owner, a machine rental company, a day or two prior to plaintiff's injury. The city was engaged in improving Brush Creek, having employed in the work about 700 men, but it had no one competent to operate a back-filler. Consequently, its superintendent of the work

employed plaintiff for that purpose and at about eight-thirty A. M. of the morning of Saturday, January 16, 1932, he started to work. He had never operated a Parsons back-filler, such as this machine, but had operated a Buck-eye type of back-filler. The two machines were used for the same purpose and were constructed along the same plan, except the arrangement was different. However, it appears that plaintiff was sufficiently versed with back-fillers to be able to operate the Parsons back-filler in question. When he started to work he was, met by the superintendent who told him to start the machine. He had quite a bit of trouble starting the motor because the weather was cold. After getting it started he got upon the seat but when he pushed the clutch lever forward the machinery would not start because the chain was so loose it jumped off of the large sprocket wheel. He reported to the superintendent that he could not move the machine because the "chain won't stay on that gear, you had better fix it." Plaintiff testified that he was not employed to do any other work than to operate the machine; that he was not familiar with its mechanism; that the superintendent replied that there was no way to fix the machine that day, "wait until Monday, and then we will fix it." . . . "The first thing Monday morning when you get to your job, start your motor up and warm your motor up and oil it up so it will be ready for the work when I get there;" that on Saturday the superintendent brought a helper to the machine and procured a piece of two by four about five or six feet long and told the helper to put it "on the frame underneath this chain;" that the helper did this, prying the chain up so as to take the slack out of it; that they worked with the machine in this condition the balance of the day, "until about two P. M."

Plaintiff testified that he arrived at work early Monday morning, pulled the starting lever back so that the machine would not be in gear and started up the motor. The machine was not operated but the motor had been running for about ten minutes when the superintendent came to him and said: "Let us fix that chain this morning the first thing." Plaintiff replied: "You will have to get somebody else to fix it." The superintendent then said: "I guess we could fix it. He said, 'the only thing to do to it' he says, 'is to get up on there' he said, 'and get hold of that chain and see if we had enough slack to take a link out of the chain.'" "He said that taking a link out would make the chain that much shorter and possibly we could fix it." In order to see if there was enough slack in the chain to take a link out plaintiff, in obedience to the order of the superintendent, stepped over the horizontal cross bar connecting the starting lever with the clutch. He was facing the seat with his back to the motor, and while in a position astride of the cross bar, he put his hand under the chain about an inch and a half from the top of the large sprocket

wheel, when the machine, without intervention of any human agency, suddenly and unexpectedly started up, dragging his hand into the sprocket.

Plantiff testified that he "got up on top of the back-filler" and astride the cross bar, about three and one-half or four feet from the clutch lever and that no part of his body was within eighteen inches of the bar; that during all of this time the superintendent was standing only a few feet away watching the operation. He further testified that he had seen links taken out of chains before and that he had helped mechanics take them out; that taking them out was a very simple operation.

There was also evidence that it was a common practice for mechanics, in taking a link out of a chain, to do so while the motor was in operation. There was evidence on the part of the plaintiff that the machine vibrated somewhat when the motor was in operation but that the vibration was not sufficient to cause the clutch to engage. In fact, the clutch could not be made to engage except by thrusting forward the clutch lever as hereinbefore described.

Plaintiff testified that the clutch lever did not operate easily but required about as much force to push it forward as it would to pull up on an emergency brake of an ordinary automobile in stopping it, going down "a pretty good sized hill." Plaintiff further testified that the back-filler was setting on level ground; that the superintendent was directing and showing him what to do at the time he was injured; that what he did he was doing at the superintendent's orders; that no one was present except the witness and the superintendent; that he did not have hold of the chain at the time and did not pull up on it but "just started to get hold of it;" that he had both hands under the chain and had a double pair of cotton gloves on each hand. He testified that he knew nothing about how the machine and the mechanism of the back-filler was made or constructed and nothing about the inner workings of it. He knew nothing about how the clutch and various parts inside the machine were built. He testified that he had no control of the machine or its parts; that his sole duty was to operate the machine; that he had worked around construction machinery for about ten years prior to his injury and had operated machines such as a back-filler from five to seven years; that he had never before operated a Parsons back-filler, such as the one in question, but was able to operate the one when he was engaged by the superintendent for that purpose. He stated: "I knew how to operate it;" that he did not know how to operate it as well as he knew how to manage a Buck-eye back-filler, as he was not as familiar with a Parsons back-filler; that chains had slipped before on back-fillers that he had operated.

"Q. It is not an uncommon or unusual thing to happen on a back-filler? A. No.

"Q. That the chain will slip? A. No; when it is worn it is bound to slip.

"Q. When it goes around those gears it wears down and naturally gets loose? A. Yes."

He further testified that when he was hurt:

"Q. The motor probably was running ten or twelve or thirteen minutes, something like that? A. Something.

"Q. And you never shut it off at any time? A. No; I did not have no orders to shut it off."

He further testified that in September, 1933, he went to New Mexico for the Kinlen Construction Company to see if their "machines operated right. All I did was to help the operator on the machine for two months and seventeen' days;" that these machines were "digging machines," and "stuff like that;" that he did this work for about three months; that he had a mechanic with him all of the time; that all he did was to operate the machines; that he did not fix any.

He admitted that he testified in his deposition that vibration of the machine in question caused it to start up and injure him but stated at the trial that he was just guessing at the former time; that since his deposition was taken he had experimented with the machine and found that its vibration would not start it up.

There was evidence on the part of the plaintiff that one, standing in a position over the horizontal cross bar connecting the clutch lever with the clutch, could not cause the clutch to engage by "rubbing" the bar. There was other evidence of an expert character to the effect that the machine would not have started up as it did had it not been in a defective condition. All of the testimony tended to show that it started up by reason of the clutch becoming engaged.

Defendant's evidence tends to show that its superintendent employed plaintiff because the latter was an experienced operator of back-fillers and that the back-filler in question was a Buck-eye.

The superintendent, testifying for the defendant, stated that there was no vibration of the machine when the motor was running; that the machine had not been used by the defendant prior to the time plaintiff was hurt; that while the clutch was enclosed in the housing the housing extended over a part of the small sprocket wheel only, the housing being open where the sprocket chain operated; that the machine was not inspected by the defendant prior to the time of plaintiff's injury. There was other evidence on the part of the defendant that the clutch consisted of the clutch plates, which we have already described, fingers, springs and bearings; that in January, 1932, before it was rented to the city, its owner caused the machine to be over-

hauled, the valves were ground, new rings were put in the motor, the clutch case had been broken and a new one was installed, a new drive chain and pins in the caterpillars were put in and two bearings were restored; that the clutch was dissembled and new clutch fingers were put in "because the old ones were worn;" that "Clutch fingers are little plates that force the two clutch pans together, that causes it to turn;" that the clutch was inspected and, in addition to installing two fingers, the clutch plates were also renewed and the clutch was entirely overhauled; that the chain in question was also renewed, but when put in it was still loose and the machine having no adjustment on it to take up the slack in the chain the only way to take it out was by inserting a whole or a half link; that the chain was too short to put in half a link so a whole link was put in, which made the chain "flop a little;" that if a half link had been put in it would have made the chain too short and it "would have to cut the bearings out of the drive shaft" and "would have used that bearing up on the final drive;" that before another half link could be put in the machine would have to be driven so it would wear and stretch the chain, then a whole link could be taken out and a half link put in; that the chain was adjusted as well as it could be at the time the machine was overhauled and the machine was put in good condition.

From the evidence an inference may be drawn that a proper chain would not jump off the sprocket wheel or ride the cogs except where the machine was not standing on a level, was in a twist, "where the machine was out of line," or, where the machine was overloaded. There is no evidence of any of these conditions in this instance. Plaintiff testified that the machine was level.

There was other testimony on the part of the defendant that after the new chain was put in it "was just a little loose but not loose enough to climb off;" that one of the fingers on the clutch was broken; that all of them were renewed; that the normal life of a sprocket chain is two years; that the machine had three ball bearing races supporting the shaft on which the clutch turned; that there were eleven or twelve bearings to each race; that these bearings sometime wear, break or give down; that if they did so they would throw the clutch out of line; that this would make the clutch hard to engage or disengage and might cause the clutch to slip and wear out the discs; that if the clutch were worn it would be harder to engage than if not worn; that the clutch had four small coil springs which very seldom wore but sometimes broke; that if it had worn springs "you would not have any clutch;" that it was very seldom necessary to replace the springs; that the clutch had dogs or arms connected with the clamps, called clutch arms, and that these were replaced when the machine was overhauled; that if the dogs were worn it would not cause the clutch to work improperly; that if the clutch plates became

roughened or worn they would not grab "because the clutch had plenty of clearance when it is thrown out." . . . "I should' imagine three or four inches when they are disengaged;" that "the average layman could look at a bearing or a dog that was worn or a spring that was worn and it might not mean anything to him;" that it would require a competent mechanic to discover its defective condition. However, another witness for the defendant testified that *"A clutch plate sometimes gets roughened and worn and causes it to catch on the next plate*, and in order to determine those conditions, it is necessary for a mechanic to understand that kind of machinery to inspect and determine its condition and to repair the same."

There was evidence on the part of the defendant that a clutch will sometimes roll with the motor when the latter is either hot or cold. There was other evidence on the part of the defendant that an inspection was made by employees of the owner of the machine the day after plaintiff was injured and it was found that the clutch was in good condition; that three or four days thereafter it was taken back to the owner's warehouse where the machine was checked over, including the clutch, the chain and the general working parts, and it was found that there was nothing wrong with any part of it; that it was afterwards used upon other work without any further repairs; but it was never again used by this defendant.

There is some discrepancy in the evidence as to the age of the machine. Some of defendant's witnesses testified that it was a recent model and had been very little used; that, in fact, it was practically new. There was other testimony, on the part of the defendant, that "it was called a '27," but the witness could not say for certain whether it was an older model than 1927. However, it appears to us that its condition would depend more on its usage than its age. The fact that it needed so much work done upon it, when it is claimed it was overhauled, would indicate that it had received considerable usage at the time plaintiff was injured and was by no means a new machine.

Defendant contends that its instruction in the nature of a demurrer to the evidence should have been given. In this connection our attention is drawn to the fact that the loose chain had nothing to do with the starting of the machine in motion. This may be admitted. Defendant further insists: "That there is no evidence of any defect in the machine; no evidence that Kansas City or any of its employees knew anything about the machine prior to the time it was operated by Jenkins (plaintiff); no evidence that it had ever started before in this manner; that there was no evidence of its lack of repair, of its age or of its suitability or adaptability to the work for which it was constructed. The case presents merely a situation of a vibrating machine with the motor in operation and the clutch suddenly engaging without the lever being operated by the operator."

We may say, in this connection, that plaintiff's evidence shows that the vibration of the machine did not cause its starting.

The law is well settled in this State that the doctrine of *res ipsa loquitur* applies in master and servant cases where the circumstances allow it. In reference to the automatic starting of a machine the court said in the leading case of Blanton v. Dold et al., 109 Mo. 64, 75: "It is sometimes a close question to determine what inferences from the facts may reasonably be drawn; but it is enough for our present purpose to say that we are of the opinion that where such a machine as this starts into motion, entirely out of the usual manner of its operation, as shown in the case at bar, its action affords prima facie evidence of some want of care in its original construction or then condition, calling for explanation from the party responsible therefor." In Gordon v. Muehling Packing Co., 40 S. W. (2d) 693, l. c. 701, it is stated:

"We will grant, therefore, the appellant's inference that, as between master and servant at least, the doctrine of *res ipsa loquitur* should be limited to cases where the accident and its attendant circumstances speak negligence, or, as it said, 'it must be such an occurrence as carries proof of negligence on its face.' However, the courts of this and other States are, we think, practically unanimous in holding that when a somewhat complicated machine and the power operating same is furnished by the master for the servant's use in doing the master's work, and is so constructed as to be operated and controlled by the servant by a simple mechanical device, such as a lever or switch button, and which is not intended to start or stop except on the servant's use of such device, the servant has no knowledge or means of knowledge as to its operation other than the starting device and is not charged with keeping it in repair or good operating condition, and such machine does start to operate automatically and without apparent cause, or in a different manner than intended, causing the servant's injury, then such accident and its attendant circumstances do speak negligence, and it is such an occurrence as carries proof of negligence on its face and casts on defendant, having peculiar knowledge thereof, the burden of disproving negligence. Such is this case. We do not hold, however, as defendant would have us do, that plaintiff, in order to come within the rule of *res ipsa loquitur*, must show such a state of facts surrounding the accident as excludes every reasonable hypothesis except the master's negligence. The attendant facts must be such as to raise a reasonable inference of defendant's neglignce but not necessarily such as to exclude every other inference. The jury must draw the inference of negligence from the facts proven, and it must be a reasonable one, but the rule applicable to circumstantial evidence and reasonable doubt in criminal cases does not apply."

We think that the facts in the case at bar bring it within the *res ipsa loquitur* doctrine. Here plaintiff was employed to operate the machine, only, and not to inspect or repair it. The clutch was entirely enclosed in the housing and he knew nothing of its mechanism. The evidence shows that the machine would not start operating automatically unless there was some defect in it. [Ash v. Woodward & Tiernan Ptg. Co., 199 S. W. 994; Taul v. Askew Saddlery Co., 229 S. W. 420; Ferguson v. Fulton Iron Works, 259 S. W. 811; Uhl v. Century Elec. Co., 295 S. W. 127; Lowe v. Fox Laundry et al., 274 S. W. 857; Meade v. Missouri Water & Steam Supply Co., 300 S. W. 515; Nelson v. C. Heinz Stove Co., 8 S. W. (2d) 918; Kitchen v. Schlueter, 20 S. W. (2d) 676; Harke v. Haase, 75 S. W. (2d) 1001; Bartlett v. Pontiac Realty Co., 31 S. W. (2d) 279; Baugher v. Gamble Constr. Co., 26 S. W. (2d) 946; Stroud v. Booth Cold Storage Co., 285 S. W. 165.]

We have examined the cases of Removich v. Constr. Co., 264 Mo. 43; Klebe v. Distilling Co., 207 Mo. 480, and like cases cited by the defendant, and find them not in point. Most of them involve explosions, the breaking of ropes or cables, the giving away of handle bars on hand-cars or braking apparatus on railroads. In some of them specific acts of negligence were pleaded. They are distinguished in the cases of Ash v. Woodward, supra, and Gordon v. Muehling Packing Co., supra. In one case cited by defendant, Grindstaff v. Goldberg & Son, 40 S. W. (2d) 702, which involved the falling of a steel truss, injuring plaintiff, the court, l. c. 705, distinguished such cases from cases involving the unexpected automatic action of a complicated mechanism starting into operation entirely out of the usual manner of its operation.

It is true that there is no evidence that the machine here in question ever automatically started before. In Chiucariello v. Campbell (Mass.), 44 L. R. A. (N. S.) 1050, cited with approval, by our Supreme Court in Ash v. Woodward, supra, l. c. 998, the court stated, l. c. 1052, 1053: "In most cases of the unexplained starting of a machine, in which an action has been maintained for injuries thereby caused, there has been some further evidence of negligence on the part of the employer, either by evidence or previous instances of such starting, or of other trouble in operation, that were or ought to have been known to him, or that it was old, worn-out, second-hand, or otherwise in need of more inspection and repairs than it had received, or that it was improperly set up or adjusted, or that recent repairs had left it in bad condition, or otherwise." But in that case the Supreme Court of Massachusetts held the employer liable under the *res ipsa loquitur* theory, although there was no evidence of any of the particular things therein mentioned, the only facts appearing were that the machine started up and it would not have started unless it

had been in a defective condition. In that case, the author of L. R. A. in his notes states, l. c. 1050, that in practically every case wherein the rule of *res ipsa loquitur* has been applied in master and servant cases "there was, in fact, evidence of negligence or of defects in the machine" and at l. c. 1053, he says: "The position of the Missouri courts (as to that matter) cannot be definitely determined from the reported cases."

However, we need not say what the position of the courts in Missouri are in reference to this matter, for the reason that there was ample evidence in this case of a defective clutch. The evidence in this connection shows that the machine would not have started up under the circumstances, unless the clutch had been defective. There was also evidence tending to show that the clutch was badly worn only a short time before plaintiff's injury. It is true that the employees of the rental company stated that the worn parts were replaced and the machine put in good condition but the jury was at liberty to believe their testimony that the parts were worn but to disbelieve their testimony that they were renewed and the machine put in proper condition. [Gould v. C. B. & Q. R. R. Co., 315 Mo. 713.] They could have believed that if the work was actually done upon the clutch it was performed improperly in some respect. There was direct evidence in this case that the machine was defective or it would not have started in the manner it did. There was evidence, also, from which the jury could believe that while the chain in question was worn and needed replacing, it was not replaced. While the chain had nothing to do with the starting of the machine, yet, whether it was worn was a material matter, and the fact that the witnesses for the defendant testified that it was replaced, and there was evidence from which the jury could believe to the contrary and thus arrive at the conclusion that defendant's witnesses were contradicted in a material manner, the jury could believe any part of their testimony and reject the rest. [Gould v. C. B. & Q. R. R. Co., supra; Peycke Bros. Com. Co. v. Lehigh Valley R. Co., 224 S. W. 71.] The jury was not required to believe the testimony of some of defendant's witnesses to the effect that no defect such as they described, in any of the parts of the clutch could cause it to automatically start. One of them admitted that "a clutch plate sometimes gets roughened and worn and causes it to catch on the next plate." Neither was the jury required to believe that the clutch was inspected after the casualty and found in good condition.

It is not necessary to build inference upon inference in this case in order to arrive at the conclusion that the clutch in this machine was defective and that shortly before the accident if it was repaired at all, the work was not done properly.

It is claimed by the defendant that notice to the city of the defective condition was required to be shown and there is no evidence that the city had any notice. The rule is well established that the master owes a nondelegable duty to furnish his servant with reasonably safe appliances and in discharging this duty to inspect them from time to time as the occasion demands. [Ash v. Woodward, supra, 1 c. 999.; Craven v. Halpin-Boyle Constr. Co., 15 S. W. (2d) 853.] There is undisputed testimony that the city did nothing to find out the condition of the machine that it turned over to plaintiff, its servant, to operate; and if it can rely upon the owner of the machine to have discharged the aforesaid duty, of course, it is liable for any negligence that the owner or his servants was guilty of.

An attempt has been made by the defendant to distinguish this case from others allowing recovery under the *res ipsa loquitur* theory, on the ground that the motive power in the other cases was supplied by a general power plant in a factory where the machines were located, whereas, in the case at bar, the power was supplied by the machine, itself, which the plaintiff was in charge of as operator.

The source of the power for the operation of the machine is not material in these cases unless there is some inference to be drawn that the cause of the automatic starting of the machine is connected wholly or partially with some defect in the appliances through which the power is furnished and the evidence shows that those appliances are not within the control or knowledge of the servant but wholly under the control of the master. In the case at bar there is no inference to be drawn from the happening, itself, or in fact from the evidence, that there was any defect in the motor (the source of the power of the machine) or that anything about the motor, itself, had anything to do with the machine.

It is further insisted that the machine was a complicated one, and that the *res ipsa loquitur* doctrine does not apply in such instances. There are some older cases so holding but the more recent cases are to the contrary. [See Gordon v. Packing Co., supra; Grindstaff v. J. Goldberg & Son, supra.]

It is claimed that there are other possible causes of the casualty other than the defect in the machine, that is, that it could have been caused by the vibration of the machine; that plaintiff might have touched the cross bar which led from the clutch lever to the clutch (there was evidence on the part of the defendant that the machine was easily thrown into gear and that contact with the cross bar might cause it to start) and defendant also says it might have started up by reason of the clutch rolling with the motor or that, in fact, plaintiff may have left the clutch lever in gear, and that, under such circumstances, the doctrine of *res ipsa loquitur* never applies.

It will be noted that these contentions do not go to the accident, itself, but to the evidence concerning the same. Plaintiff's evidence shows that he did not leave the machine in gear; that he did not touch the cross bar; that vibration did not cause it to start and there was other evidence that it could have been started only by a proper manipulation of the starting lever which required considerable force to operate. So the matters mentioned by the defendant were negatived by plaintiff's evidence.

It is true that plaintiff, in his deposition, testified that the vibration of the machine caused it to start. However, he testified differently at the trial and he was not conclusively bound by the statements made in his deposition. [Hodges v. Am. Nat'l Ins. Co., 6 S. W. (2d) 72; Haddow v. St. Louis Public Service Co., 38 S. W. (2d) 284.]

It is claimed that the machine was under the control of plaintiff; but plaintiff's testimony is to the contrary. Admitting that the evidence shows that he was an experienced operator of such machines, the evidence further tends to show that he had no duty connected with its operation except to oil it. The sole duty was upon the defendant to inspect it and see that it was in proper repair and, consequently, in the sense that the word "control" is used in connection with these cases, plaintiff had no control over it, that is control of the mechanism for the purpose of knowing its condition and of repairing it. While, he testified that he probably knew more than the superintendent did about the machine, the fact that the superintendent did not know very much, if anything, about it, is not in defendant's favor for, as before stated, it was the duty of the defendant to use ordinary care to see that the machine was in a reasonably safe condition. This duty could be discharged only by an employee of defendant who did know something about the machine and more than plaintiff knew of it, as disclosed by the evidence.

It is insisted that the plaintiff was guilty of contributory negligence, as a matter of law. In this connection it is said that although plaintiff testified that he knew that when the clutch was engaged the gears and chain would commence to revolve suddenly and that the machine was vibrating at the time he was injured, notwithstanding these facts "he jumped up on the machine, putting one foot over the bar that leads from the clutch lever to the clutch, facing the operator's seat, and bent over, and with doubly gloved hands, took hold of the drive chain on the idler gears. All this time the motor had been running and the machine had been vibrating. It is also beyond doubt that this man was an experienced operator, having operated these kind of machines for a period of five to six years and possibly seven years on spare time. Under this state of facts we cannot reach any other conclusion except that plaintiff deliberately put himself in a place of danger and is guilty of contributory negligence as a matter

of law. The evidence also shows that defendant in error was in complete charge of the machine."

It will be remembered that the evidence shows that there was not sufficient vibration in the machine to cause it to start up and that it was a common practice to take hold of the chain for the purpose of seeing if it could be repaired by inserting another link or half a link, without stopping the motor. It will also be remembered that the undisputed testimony shows that plaintiff did the things mentioned by the defendant in the presence of the superintendent and his testimony shows that it was at the direction of the superintendent and that the superintendent did not tell him to stop the motor. Under all of the facts and circumstances, we could not say that plaintiff was guilty of contributory negligence, as a matter of law. [Craven v. Halpin-Boyle Constr. Co., supra; Davis v. City of Independence, 49 S. W. (2d) 95.]

It is claimed that the plaintiff assumed the risk but the servant never assumes the risk of the master's negligence. [Morris v. Atlas Portland Cement Co., 19 S. W. (2d) 865.] The judgment is affirmed. All concur.